EMIL LANDAU et al., Respondents-Appellants, v JOSEPH PER-
CACCIOLO et al., Appellants-Respondents.

Second Department, December 29, 1978

## APPEARANCES OF COUNSEL

*Hofheimer Gartlir Gottlieb & Gross (Bernard Gartlir, Donald M. Weisberg* and *David L. Birch* of counsel), for respondents-appellants.

*Keegan, Keegan, Hecker & Tully, P. C. (Andrew W. Tully, Jr.,* of counsel), for appellants-respondents.

## OPINION OF THE COURT

HOPKINS, J. P.

The defendants are the County of Putnam and the members of the Board of Supervisors of the county. In March, 1975 the defendants entered into a contract to purchase some 50 acres of land from the plaintiffs at a price of $14,000 per acre ($700,000) for use in the disposition of solid waste. The contract did not close, and the plaintiffs brought this action for specific performance of the contract.[1]

The defendants interposed defenses, claiming fraud by the plaintiffs, among other things, and counterclaims, some of which were based on alleged fraud by the plaintiffs.

Special Term decided in favor of the plainitffs and decreed specific performance of the contract, finding that the defendants had failed to establish fraud, and dismissed the counterclaim for rescission.

On this appeal the defendants make two principal arguments: (1) that the evidence of fraud on the part of the plaintiffs vitiates the contract and dictates rescission, and (2) that the undisclosed interest of a public officer of the county invalidates the contract.

■ The judgment should be reversed and rescission of the contract directed. The evidence establishes that the county civil defense director had an undisclosed interest as real estate broker in the performance of the contract in violation of section 803 of the General Municipal Law and public policy.

I

In 1968, when the plaintiffs acquired the 50 acres under the

---

1. The complaint also demanded damages and an injunction restraining the defendants from using the property for refuse disposal.

contract, together with 40 other contiguous acres, for a total price of $200,000, Frank Barbarita was the broker for the transaction and received a fee. In 1975 Barbarita held the public office of county civil defense director, as well as Federal and State aid co-ordinator[2] (L 1951, ch 784, § 22, as amd). The issue on this appeal involves Barbarita's role vis-à-vis the contract between the parties.

Sometime in February, 1975 Barbarita informed the plaintiffs that he had a party interested in the purchase of the property. He arranged for a meeting in his office with plaintiff Landau and defendant Thomas Bergin, the Supervisor of the Town of Carmel. The town had been ordered to stop using an unrelated site for garbage disposal, and Bergin was looking for another property to use instead. Negotiations for the purchase of the property by the county proceeded between Bergin and the plaintiffs, with the knowledge and participation of Barbarita, who testified that the plans for the new site were kept secret in order to avoid any potential public opposition. Barbarita, though he was also animated by a desire to solve the county's waste problem, was acting in the capacity of a broker and expected to be paid in the event of a sale.

On March 24, 1975 Barbarita, Bergin and County Attorney Nicholas Winnie, went to Albany to present to the State Department of Environmental Conservation the proposal for the use of the property.[3] On the way to Albany, Barbarita told Winnie and Bergin that he was the broker in the transaction and anticipated the payment of a commission by the plaintiffs; and he suggested that the contract not contain a clause recognizing him as the broker, since public knowledge of the fact would create criticism and he had confidence in the plaintiffs' promise to pay him. As a result of their efforts the State Department of Environmental Conservation approved the new site.

On March 25, 1975 a special meeting of the County Board of Supervisors was called; at that meeting a resolution was adopted by the board authorizing the purchase of the plaintiffs' property. Later that day plaintiffs and the Chairman of

---

2. The defendants contend that Barbarita negotiated on behalf of the county for Federal aid in the use of the property as a disposal center; and there was evidence introduced at the trial tending to support that contention.

3. The State had directed that the use of the old site be terminated by the end of March, 1975.

the Board of Supervisors executed the contract prepared by the County Attorney.

The contract provided for the purchase of the property at $14,000 per acre, subject to an accurate survey and to an appraisal that the value of the land was at least $14,000 per acre. It also provided that upon execution of the contract the county would be entitled to use the property as a refuse disposal center and, in the event title did not close, the county would be obliged to restore the property. The contract contained the following provision: "The parties agree that there was no broker in any way concerned with the transfer of this realty." Barbarita testified that although he had waived a commission after the institution of taxpayers' suits challenging the validity of the sale, he and the plaintiffs agreed that he was to be paid a consultant's fee for his labors.

The evidence at the trial made clear that the plaintiffs recognized Barbarita's labors and expected to pay him, if not a full commission, a consultant's fee.[4] Indeed, in July, 1976 Barbarita requested payment of $70,000 from the plaintiffs as a consulting fee. The evidence is less clear as to the knowledge of the county officers with respect to Barbarita's interest. Barbarita testified that Bergin, Winnie and Joseph Percacciolo, who was the Chairman of the Board of Supervisors, knew of his interest as broker; there is countervailing evidence.[5] However, Barbarita did not disclose his interest to the county board in accordance with section 803 of the General Municipal Law. In any event, the issue of credibility is not paramount, since there is no evidence that the other members of the Board of Supervisors knew of Barbarita's interest.

Except for the question raised by Barbarita's role, the other conditions of the contract were fulfilled. The county obtained three appraisals indicating valuations of the property of $17,000, $14,000 and $15,500 per acre. The closing of the contract was delayed, beyond the stipulated 90-day period after its execution, by the institution of the three taxpayer actions challenging the validity of the sale. None of the

4. Plaintiff Shapiro testified that he told Barbarita that the latter must have confidence that the plaintiffs would "behave ethically and morally with him in resolving a fee [for] his consultant work".

5. Bergin testified before the State Investigation Commission that he did not know of Barbarita's interest in a fee. Barbarita also testified that he assumed Percacciolo knew of his involvement because he thought that Winnie or Bergin had told Percacciolo.

actions challenged Barbarita's participation as broker, which remained undisclosed. After these actions were concluded, the plaintiffs offered to close on May 3, 1976, but the defendants sought further delay. In the meantime, the defendants had used the property as a refuse disposal site.

On June 23, 1976 the plaintiffs commenced this action and secured a temporary restraining order forbidding further use of the land by the county, which was included within an order to show cause seeking an injunction *pendente lite* for the same relief.[6] Before the service of the defendants' answer, the State Investigation Commission held hearings on July 7 and 8, 1976 during which time Barbarita's involvement with the property was disclosed. On July 15, 1976 the County Board of Supervisors, in the wake of this information, adopted a resolution rescinding the contract.

The defendants raise two related claims on this appeal: (1) that the fraudulent misrepresentation by the plaintiffs of a material fact—that there was no broker—induced the purchase of the property by the defendants, and (2) that Barbarita's knowing failure to disclose his interest, coupled with the plaintiffs' knowledge of his interest and the failure to make such disclosure, violated section 803 of the General Muncipal Law and public policy. Either of these contentions, the defendants argue, is sufficient to defeat the plaintiffs' action and justify rescission.

We will consider the second claim first. If the defendants are correct in their assertion, we need not examine the first claim which depends for its resolution on several contested factual disputes, as well as the legal constituents of inducement and reliance which the claim of fraud comprehends.

## II

We think that the claims of statutory violation and contravention of public policy rest on fairly clear factual grounds. Barbarita, as a county public official, was interested in a county contract, and actually concealed his interest with the knowledge and assistance of the plaintiffs. We must therefore confront the question of whether that conduct is reason to abrogate the contract.

In 1964 the Legislature enacted article 18 of the General

---

6. By stipulation the application was adjourned for several weeks, during which time the county was allowed to continue to use the land.

Municipal Law, addressing directly and in one place the problems arising from conflicts of interest of municipal officers. It repealed those provisions of the consolidated laws which had dealt with conflicts within the several categories of municipal government (County Law, § 412; Education Law, § 1617; Town Law, §§ 104, 176, subd 31; Village Law, § 128, subd 5; § 332; General Municipal Law, § 88) and replaced and expanded these statutes by statutory prescriptions common to all such municipalities. First, the statutory revision declared that no municipal officer or employee shall have an interest in any contract with the municipality when he individually or as a member of the board has the power or duty to negotiate, authorize or approve the contract (General Municipal Law, § 801).[7]

Second, the statutory revision imposed a duty upon any municipal officer or employee to publicly disclose in writing, the nature and extent of his interest in a contract with the municipality by notice to its governing body, which written disclosure must then be set forth in the official record of the proceedings of the body (General Municipal Law, § 803).[8] An "interest" is generally defined by the statute as "a direct or indirect pecuniary or material benefit accruing to a municipal officer or employee as the result of a contract with the municipality which such officer or employee serves" (General Municipal Law, § 800, subd 3).

Two sanctions are prescribed by the statute for a violation

---

**7.** Section 801 of the General Municipal Law reads, so far as relevant: "Except as provided in section eight hundred two of this chapter, (1) no municipal officer or employee shall have an interest in any contract with the municipality of which he is an officer or employee, when such officer or employee, individually or as a member of a board, has the power or duty to (a) negotiate, prepare, authorize or approve the contract or authorize or approve payment thereunder".

**8.** Section 803 of the General Municipal Law, reads, so far as relevant:

"1. Any municipal officer or employee who has, will have, or later acquires an interest in any actual or proposed contract with the municipality of which he is an officer or employee, shall publicly disclose the nature and extent of such interest in writing to the governing body thereof as soon as he has knowledge of such actual or prospective interest. Such written disclosure shall be made part of and set forth in the official record of the proceedings of such body. Once disclosure has been made by an officer or employee with respect to an interest in a contract with a particular person, firm, corporation or association, no further disclosures need be made by such officer or employee with respect to additional contracts with the same party during the remainder of the fiscal year.

"2. Notwithstanding the provisions of subdivision one of this section, disclosure shall not be required in the case of an interest in a contract described in subdivision two of section eight hundred two hereof."

of the provisions of article 18 of the General Municipal Law. It renders void and unenforceable any contract willfully entered into in which there is an interest prohibited by its terms (see General Municipal Law, § 804).[9] Moreover, it makes a willful violation of its provisions by a municipal officer or employee a misdemeanor (General Municipal Law, § 805). It is urged by the plaintiffs that the sanction of invalidation of a municipal contract does not apply to the facts in this case because Barbarita was not an officer having the power or duty to negotiate or authorize the making of the contract in issue, and that, accordingly, any interest he might have had was not "prohibited" within the meaning of the statute (see General Municipal Law, § 801).

It is true that Barbarita in his capacity as a public officer held no powers or duties with respect to the purchase of land by the county, since that authority was vested in the County Board of Supervisors which had not delegated to Barbarita any of its functions in the purchase of the plaintiffs' land. The statute under analysis does not, however, altogether sustain the interpretation put forward by the plaintiffs. As the statute reads, "[a]ny contract willfully entered into by or with a municipality in which there is any interest prohibited by this article shall be null, void and wholly unenforceable" (General Municipal Law, § 804). An undisclosed interest of a municipal officer or employee is undoubtedly an "interest prohibited by this article", and by the terms of the statute, renders a contract, "willfully entered into by or with a municipality", unenforceable. Barbarita's interest was undisclosed, and the plaintiffs willfully entered into the contract, since they executed it with full knowledge of Barbarita's interest. Without more, it can be said that the contract is unenforceable under the statute. Moreover, even if we were to accept the plaintiffs' interpretation of the statute, we think that in the perspective of the whole transaction, viewed against article 18 of the General Municipal Law, the contract is unenforceable.

We note first that the statute characterizes a willful violation of its provisions as a misdemeanor (see General Municipal Law, § 805).[10] The enforceability of a contract does not

---

**9.** Section 804 of the General Municipal Law reads: "Any contract willfully entered into by or with a municipality in which there is an *interest* prohibited by this article shall be null, void and wholly unenforceable." (Emphasis supplied.)

**10.** Section 805 of the General Municipal Law reads: "Any municipal officer or employee who willfully and knowingly violates the foregoing provisions of this article shall be guilty of a misdemeanor."

always hinge on the existence of specific statutory language which commands its annulment because of illegality.

Thus, the United States Supreme Court has said that "a statute frequently implies that a contract is not to be enforced when it arises out of circumstances that would lead enforcement to offend the essential purpose of the enactment" *(United States v Mississippi Val. Co.,* 364 US 520, 563; see, also, *United States v Acme Process Co.,* 385 US 138, 145). Hence, we look to the relationship existing between the municipal officer or employee and the municipality, the declaration of legislative policy, and the language of the statute, fairly interpreted, in order to determine whether, under the given circumstances, the contract ought to be enforced.

The relationship between a municipality and its servants springs from the fiduciary roots of agency, a concept deeply embedded in the common law *(Michoud v Girod,* 4 How [45 US] 503, 555; *Crocker v United States,* 240 US 74, 79-80). The concept incorporates the ancient wisdom that a man may not serve two masters, and statutes carrying out its dictate are not to be construed strictly against the municipality *(Smith v City of Albany,* 61 NY 444, 447). Indeed, contracts implicating the relationship are scrutinized closely and for the benefit of the public (4 Williston, Contracts [3d ed], § 615A, pp 630-631; § 626, p 842). Early statutes, following the contours of the common-law doctrine of agency, forbade the enforcement of contracts made by a public officer on behalf of a municipality in which he had an interest (cf. *Smith v City of Albany, supra; People ex rel. Schenectady Illuminating Co. v Board of Supervisors,* 166 App Div 758, 760). Some statutes even prohibited any interest in any municipal contract (cf. *Roosevelt v Varnum,* 12 How Prac 469, 471-472), on the theory that an exchange between public officers of favors was thus prevented *(supra,* p 474).

The fiduciary character of the agency relationship permits the agent no interest adverse to his principal (Restatement, Agency 2d, § 389), and demands that the agent make full disclosure of any such interest to the principal (Restatement, Agency 2d, § 381; comment *d,* p 184; *Coos County v Elrod,* 125 Ore 409; cf. *Hadden v Consolidated Edison Co. of N. Y.,* 45 NY2d 466; *Western Elec. Co. v Brenner,* 41 NY2d 291, 295), even though the principal may waive his right to object (Restatement, Agency 2d, §§ 390, 391). When, therefore, the Legislature recast the various statutes regulating the conduct

of municipal officers into one organic whole—perhaps in response to criticism that the statutes were a "patchwork" (Kaplan and Lillich, Municipal Conflicts of Interest: Inconsistencies and Patchwork Prohibitions, 58 Col L Rev, 157, 169-174, 182), it re-enacted not only the earlier statutory bar against contracts made by the public officer in which he had an interest, but, in addition, imposed a requirement that all public officers and employees publicly disclose their interests to the governing body of the municipality (General Municipal Law, §§ 801, 803).

The enactment was accompanied by a statement of legislative policy (L 1964, ch 946, § 1): "The chapter, then, has a trinity of purposes: to protect the public from municipal contracts *influenced* by avaricious officers, to protect innocent public officers from unwarranted assaults on their integrity and to encourage each community to adopt an appropriate code of ethics to supplement this chapter. The Legislature declares that each purpose is a matter of State concern and adopts the following chapter accordingly, with the intention that it shall be the generic law in relation to conflicts of interest in municipal transactions, not to be superseded by local law of any municipality subject to its provisions." (Emphasis supplied.)

We think that the legislative policy may fairly be said to have been calculated to insure honesty and candor in municipal business dealings by deterring municipal officers from having interests adverse to municipalities and from influencing municipal action in order to advance their personal interests. The intent of the Legislature in requiring disclosure by any municipal officer, regardless of whether he had a voice in the making of a contract, was obviously to publicize the conflict of interest, so that the citizenry and the governing body of the municipality might take appropriate account of his personal interest in appraising the public benefit of a proposed transaction. Barbarita's interest at the time of the making of the contract before us is manifest, and his deliberate failure to make timely disclosure of his interest exemplifies the need of the statutory requirement. His fear that the transaction might not receive approval if his involvement were known, which led to its concealment, was precisely the mischief which the statute was intended to remedy. In this case his violation of the statute was compounded by his influencing the County Attorney to draw the contract so that

his interest would be affirmatively concealed, and inducing the plaintiffs to make the misrepresentation which the contract contained.

In any event, the statute makes the willful and knowing violation of its provisions a misdemeanor. The statute's plain purpose, to protect the public, is effectuated by inflicting criminal sanctions, and the legislative recognition of the criminality must be accompanied by the judicial refusal to enforce a contract which is derived from the criminal act (see *Robitzek v Reliance Intercontinental Corp.,* 7 AD2d 407, 409, affd 7 NY2d 1041; 1 NY Law of Contracts, § 397; 10 McQuillin, Municipal Corporations [1966 rev vol], p 215; cf. *Gerzof v Sweeney,* 16 NY2d 206, which considers General Municipal Law, § 103). Thus, in *United States v Mississippi Val. Co.* (364 US 520, 565, *supra),* where the statute construed therein did not provide for the invalidation of a contract made in violation of its provisions, but did penalize the violation by a fine, the Supreme Court, nevertheless, struck down the contract, saying that: "[the statute's] primary purpose is to guarantee the integrity of the federal contracting process and to protect the public from the corruption which might lie undetectable beneath the surface of a contract conceived in a tainted transaction."

Hence, we interpret the statute, under the circumstances before us, as empowering the county, once it ascertained the facts, to disaffirm the transaction. Though the result may appear harsh, the statute's direction for disclosure can only be made effective as a deterrent against similar infractions in the future and the consequent impairment of the public good by declaring a contract made in defiance of its direction void and unenforceable.

We hold, therefore, that the defendants were entitled on notice of the violation of the statute to disaffirm the contract.

## III

The defendants should not be permitted to disaffirm, however, if they did not act promptly. We think that in this case they did. Shortly after the involvement of Barbarita was revealed by the testimony in the hearings before the State Investigation Commission, notice of rescission of the contract was given to the plaintiffs by the defendants. Though there is evidence that certain county officials knew of the concealment of Barbarita's interest almost from the beginning, there is no

evidence that the majority of the members of the Board of Supervisors were aware of his interest until the revelation resulting from the hearings.

The defendants, under the terms of the contract, were entitled to, and did, make use of the property for refuse disposal. We do not now consider what, if any, damage may have been suffered by the plaintiffs as a result, nor do we consider what course is open to the plaintiffs to pursue in order to be made whole for the loss. In our view, the use of the property and the loss endured thereby are not grounds compelling the enforcement of the contract.

In the light of the disposition which we have reached concerning the legality of the contract, we do not decide the several issues argued by the parties relating to the defendants' contention that the contract is tainted by the fraudulent conduct of the plaintiffs. Hence, we express no opinion as to the findings of fact made by Special Term with respect to that claim (cf. *Shipman v Words of Power Missionary Enterprises,* 54 AD2d 1052).

Since we are reversing the judgment, the issues raised on the cross appeal by the plaintiffs with respect to the interest due on the purchase price are academic.

MARTUSCELLO and LATHAM, JJ., concur; COHALAN, J., dissents and votes to affirm the judgment on the opinion of Mr. Justice WALSH at Trial Term.

Judgment of the Supreme Court, Putnam County, dated December 21, 1977, reversed, on the law and the facts, with costs to the defendants, complaint dismissed and counterclaim for rescission granted.